**In re William J. LEUCHT, Debtor.**

**Paula K. LEUCHT, Plaintiff,**

v.

**William LEUCHT, Defendant.**

**Bankruptcy No. 97–03064–3P7.
Adversary No. 97–263.**

United States Bankruptcy Court,
M.D. Florida,
Jacksonville Division.

June 29, 1998.

*Burns.*

Richard R. Thames, Stutsman & Thames, P.A., Jacksonville, FL, for Plaintiff.

Peter Keating, Daytona Beach, FL, for Defendant.

Gregory K. Crews, Jacksonville, FL, Chapter 7 Trustee.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

GEORGE L. PROCTOR, Bankruptcy Judge.

This Proceeding came before the Court on a Complaint objecting to discharge pursuant to 11 U.S.C. §§ 727(a)(2)(A), (a)(4), and (a)(5), and seeking an exception to discharge pursuant to 11 U.S.C. § 523(a)(5), or alternatively, § 523(a)(15). Trial was held on February 19, 1998. Upon the evidence presented, the Court enters the following Findings of Fact and Conclusions of Law.

### FINDINGS OF FACT

Paula Leucht (Plaintiff) and William Leucht (Defendant) were married on September 8, 1990. (Tr. at 10). During the course of their marriage, both parties acquired an interest in two "Biscuits 'N Gravy" restaurants located in the vicinity of Daytona Beach, Florida. Plaintiff and Defendant were the sole owners of the restaurant located on Taylor Road (Taylor Road Restaurant) and had a partnership interest with an employee, Tammy Rothwell, in the restaurant located on Nova Road (Nova Road Restaurant). (Tr. at 17–18).

In February 1996, while Plaintiff was out of town, Defendant moved out of their marital home on 868 Chickadee Drive, Daytona Beach, Florida, (Chickadee home) taking with him a considerable amount of personal property. The majority of the items that were taken were first placed in storage and then brought to the home of Defendant's former wife, Maria Leucht. (Tr. at 140).

Within a few days of his departure, Defendant filed a dissolution of marriage action in the Circuit Court of Volusia County, Florida, Case Number: 96–30686–FMCI, Division 36. Although, the action is still pending it has been removed from the active docket due to the filing of Defendant's bankruptcy case. On May 2, 1996, the circuit court entered an order requiring Defendant to make the March 1996 mortgage payment on the Chickadee home, and Defendant complied. (Plaintiff's Ex. 5; Tr. at 61).

The circuit court order also required Defendant to pay Plaintiff, from and after February 26, 1996, on a monthly basis, one-half of the restaurants' "net profits." (Plaintiff's Ex. 5). Defendant was to establish a separate bank account for the deposit of those proceeds. (*Id.*) But, Defendant never secured such an account, nor did he disburse any funds to Plaintiff representing one-half of the restaurants' net profits. (Tr. at 16–17, 75, and 87). In April 1997, on advice of counsel, Defendant decided to close the Nova Road Restaurant and relinquish his interest in the Taylor Road Restaurant. (Tr. at 181–84).[1]

During the trial, Plaintiff sought to establish that the restaurants were operating profitably from February 1996 to April 1997, and that Defendant deliberately withheld from Plaintiff her share of the net profits. Defendant, however, contends that there were no net proceeds to be distributed to Plaintiff. (Tr. at 122).

Defendant acknowledged that he had been solely responsible for collecting the Nova Road Restaurant cash register monies and the depositing of those funds in the restaurant's bank account. (Tr. at 175). Ms. Rothwell was responsible for the same with respect to the Taylor Road Restaurant. (Tr. at 175). After depositing the funds, Ms. Rothwell gave Defendant the deposit receipts. (Plaintiff's Ex. 2, at 14). In addition, Defendant was solely responsible for maintaining the general ledgers of both restaurants. (Tr. at 175).

Philip Pulliam, who provided accounting services for Defendant and the two restaurants, testified that Defendant, on a monthly basis, reported daily net profits or losses with a handwritten ledger for each restaurant. (Plaintiffs Ex. 1, at 15–17). Mr. Pulliam used those figures to create the restaurants' financial statements. However, Mr. Pulliam admits that Defendant provided no

---

1. Defendant initially claimed that he ceased operating the restaurants because they were no longer profitable. (Tr. at 124–25). However, after further examination by Plaintiff's counsel, Defendant admitted that he walked away from his interests in the restaurants after mediation efforts, in conjunction with the divorce proceeding, proved fruitless. (Tr. at 184).

independent corroborating documentation to establish the veracity of the monthly reports. (*Id.* at 13). The last sales reports Mr. Pulliam received were for March 1997. (*Id.* at 19).

Financial statements for 1996 indicate that Defendant received $15,173.45 in draws from the Nova Road Restaurant and $4700 in draws from the Taylor Road Restaurant.[2] (Plaintiff's Exs. 12 and 13). Financial statements through March 1997 show that Defendant received $2100 in draws from the Taylor Road Restaurant. (Plaintiff's Ex. 13). In January 1997, Defendant received $596.87 in draws from the Nova Road Restaurant. (Plaintiff's Ex. 12). During the trial, Defendant claimed that the draws represented transfers between the two restaurants and were not received by him personally. (Tr. at 81).[3] However, Defendant provided no other evidence to establish that the draws were nothing more than a conduit for transferring funds between the two restaurants.

In an effort to bolster her contention that the restaurants had been earning a net profit during the period in question, and that Defendant deliberately withheld her share of those net profits, Plaintiff introduced testimonial evidence of a Nova Road Restaurant employee, Ms. Maureen Murray. Ms. Murray, a good friend and former roommate of Plaintiff, was an employee of the restaurant from October 1995 to June 1996. (Tr. at 68–71). She testified that on Mother's Day, May 12, 1996, she rang up $3000 to $4000 in sales, at one of the two cash registers. (*Id.* at 70).

But, Defendant's entry in the restaurant's ledger indicates that the Nova Road Restaurant earned only $1583.58.[4] (Plaintiff's Ex. 10).

Defendant produced financial statements for the period March 1996 to March 1997, which show that on March 31, 1997, the Nova Road Restaurant had an account balance of $10,434.02 and the Taylor Road Restaurant had an account balance of $9,427.74. (Plaintiff's Ex. 4; Plaintiff's Ex. 2). Defendant did not provide any account records for April 1997 that would have shown the final disposition of those funds.

Ms. Rothwell testified, during her deposition, that she did not take or receive any of the funds from those accounts in April 1997. (Plaintiff's Ex. 2, at 31). She did, however, cease using the old account for the Taylor Road Restaurant and opened another account. Defendant denies that he took personal possession of those funds, contending that the Trustee received all the monies in the two accounts. (Tr. at 92). But, the Trustee testified that he received only $2,673.39 after writing Commercial National Bank to close the accounts and forward any remaining funds to his office.

Plaintiff also alleges that Defendant transferred the titles of a 1993 Oldsmobile Achieva and a 1992 Ford van into his name with the intent to defeat any claims Plaintiff may have had to the vehicles. (Complaint, at 4). On April 11, 1996, Defendant transferred the

---

**2.** Plaintiff's counsel, in its Post–Trial Memorandum, indicates a higher amount of draws taken by Defendant. (Plaintiff's Post–Trial Memorandum, at 5). But that would require interpreting the financial statements as showing draws received on a monthly basis. However, as Mr. Pulliam testified, the financial statements reflect a cumulative amount of draws over a one-year period. (Plaintiff's Ex. 1, at 9). Thus, Plaintiff's calculations resulted from a misinterpretation of the financial statements.

**3.** Curiously, according to the same financial statements, Plaintiff continued to receive draws from the Nova Road Restaurant after the May 1996 circuit court order. From May 31, 1996 to December 31, 1996, the financial statements indicate that Plaintiff received draws totaling $14,062.52. However, Plaintiff denies, and Defendant does not dispute, that Plaintiff never re-

ceived any payments from the operation of the two restaurants pursuant to the circuit court's order. Thus, it is unclear whether (1) Plaintiff continued to receive draws from the Nova Road Restaurant, as opposed to receiving funds that represent one-half of the net profits from both restaurants, or (2) the financial statements are incorrect and Plaintiff did not actually receive those draws.

**4.** Defendant, while examining Plaintiff's Exhibit 10, testified that he reported sales of only $891.93 at the Nova Road Restaurant. (Tr. at 77). However, the ledger as provided in Plaintiff's Exhibit 10, indicates that the restaurant had sales of $1583.38 on May 12, 1996. (Plaintiff's Ex. 10). A review of both restaurants' ledgers failed to turn-up a figure consistent with Defendant's testimony; thus it is unclear where Defendant obtained such a sales figure.

Oldsmobile's title, owned jointly by him and Plaintiff, to his name solely. (Plaintiff's Ex. 8). Defendant filed his bankruptcy petition on April 24, 1997. With respect to the 1992 Ford van, Defendant transferred the title to the Chapter 7 Trustee, Gregory K. Crews, which was sold at auction on November 8, 1997. (Main Case File, Doc. 55). Plaintiff's post-trial documents offered no argument in support of its position that Defendant transferred the title to defeat her claim to the van.

In addition, Plaintiff contends that Defendant deliberately failed to list his interest in numerous items of personal property jointly owned with Plaintiff. Those items include the following: coin collection, large screen television, antiques, watch, coin ring, large gold chain, diamond ring, Lladro and Dalton figurines, paintings and pictures, timeshare unit in Aruba, *White Rock Lady* original painting.

Plaintiff testified that she and Defendant combined their respective coin collections after they were married. The collection included uncirculated $2 bills, old silver certificates, silver dollars, silver coins, old gold coins, silver and gold Italian coins, and a mint series collection from 1976 through 1994. (Tr. at 24). Plaintiff valued the coin collection between $5,000 and $10,000. (*Id.; Id.* at 65). Defendant took the coin collection when he moved out of the Chickadee home in February 1996. (*Id.* at 24). But, Defendant claims that he sold the collection, with his diamond pinkie ring, to his brother for $1000. (Plaintiff's Ex. 3, at 32–34). Defendant did not produce a bill of sale, cancelled check, or any other documents to substantiate this claim.

During his deposition, Defendant also admitted to taking the television, several figurines, and the various paintings when he moved out of the Chickadee home. (Plaintiff's Ex. 3, at 7–24). However, he claims that he no longer has possession of several of these items having left most of these items with Maria Leucht after moving out of her home in January 1997. (*Id.*). Maria Leucht testified that she and Defendant obtained many of those items while they were married. However, testimony also established that the property settlement in connection with the divorce proceeding between Defendant and Maria Leucht had vested ownership of the property in Defendant. (Tr. at 164).

With respect to the other items, Defendant contends that he lost the gold necklace in the ocean surf, returned the coin ring, which had once belonged to his father, and the portrait of the *White Rock Lady,* to his mother. (Tr. at 116; *Id.* at 117; Plaintiff's Ex. 3, at 22). In addition, Plaintiff's cousin, Don Retzler, has at all times owned the timeshare unit in Aruba. (Tr. at 57–58).

Plaintiff also alleges that Defendant failed to satisfactorily explain the loss or disposition of cash in excess of $15,000 that had been removed from the safe at the Chickadee home. However, Plaintiff testified that $15,000 in cash belonged to her cousin, Don Retzler, and was unable to provide the exact amount of any remaining cash. (Tr. at 25–26). Plaintiff admitted that she last saw the cash in the safe was a year prior to February 19, 1996, and that someone other than Defendant could have taken the money. (*Id.* at 49).

## CONCLUSIONS OF LAW

■ A bankruptcy discharge permanently enjoins creditors from collecting debts protected by the discharge. A debtor is entitled to a discharge so long as the debtor has not engaged in fraudulent or improper activity in disclosing his or her financial condition to the Court. The terms for denying discharge are codified in § 727 of the Bankruptcy Code. 11 U.S.C. § 727 (1997).

Plaintiff contends that denial of Defendant's discharge is warranted pursuant to §§ 727(a)(2)(A), (a)(4), and (a)(5). First, Plaintiff alleges that Defendant filed his petition with the intent to hinder, delay or defraud his creditors by concealing his interest in certain personal property. Second, Plaintiff claims that Defendant knowingly and fraudulently made a false oath or account of his interest in various items of personal property. Third, Plaintiff contends that Defendant has failed to satisfactorily explain the loss or disposition of property.

**11 U.S.C. § 727(a)(2)(A)**

██ Plaintiff seeks a denial of Defendant's discharge pursuant to § 727(a)(2)(A) of the Bankruptcy Code, which provides that the court is to grant a debtor a discharge, unless—

(2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—

(A) property of the debtor, within one year before the date of the filing of the petition;
....

11 U.S.C.A. § 727(a)(2) (1998). The party objecting to a debtor's discharge has the burden of proving, by a preponderance of the evidence, that the debtor's discharge should be denied.

██ Denial of discharge under § 727(a)(2)(A) requires the objecting party to show:

(i) that a transfer occurred;

(ii) that the property transferred was property of the debtor;

(iii) that the transfer was within one year of petition; and

(iv) that at the time of the transfer, the debtor possessed the requisite intent to hinder, delay, or defraud a creditor.

*Mahon v. Milam (In re Milam)*, 172 B.R. 371, 374 (Bankr.M.D.Fla.1994). The requisite intent to hinder, delay, or defraud a creditor, is satisfied upon a showing of actual, not constructive, intent. *Id.* Intent can be ascertained from the totality of the circumstances. *Id.* The Court has used the following "badges of fraud" to determine intent:

(a) the lack or adequacy of consideration;

(b) the family, friendship or close association between the parties;

(c) the retention of possession, benefit or use of the property in question;

(d) the financial condition of the party sought to be charged both before and after the transaction in question;

(e) the existence or cumulative effect of a pattern or series of transactions or course of conduct after incurring of debt or set of financial difficulties, or pendency or threat of suits by a creditor; and

(f) the general chronology of the events and transaction under inquiry.

However, where assets of some substantial value are omitted from a debtor's schedules, the conclusion that they were omitted purposely with the intent to conceal those assets may be warranted. *In the Matter of Galbraith*, 17 B.R. 302, 305 (Bankr.M.D.Fla. 1982). Only when the nondisclosed assets are of little or no value will such fraudulent intent not be presumed. *Id.*

Plaintiff alleges that Defendant transferred and concealed property consisting of furniture, antiques, artwork and other collectibles with the intent to hinder, delay and defraud creditors. Plaintiff also contends that, on the eve of bankruptcy, Defendant transferred title to a 1993 Oldsmobile Achieva and 1992 Ford van so as to defeat any claims she may have had to the vehicles. However, the facts establish that the Oldsmobile's title was transferred more than one year prior to Defendant's bankruptcy filing and that the title to the Ford was transferred to the Trustee and not with the intent to defeat Plaintiff's claim to the vehicle.

As reflected in the findings of fact, Defendant left a majority of the furniture and various collectibles to his former wife, Maria Leucht. Defendant suggests that no "transfer" within the meaning of § 727(a)(2)(A) took place because those items belonged to Maria Leucht from their prior marriage. However, the property settlement in connection with the divorce proceeding between Defendant and Maria Leucht had vested ownership of the property in Defendant. As such, the property did not belong to Maria Leucht at the time Defendant gave her possession.[5]

---

5. When Defendant and Plaintiff got married he still had ownership of the property in question. It should be noted, however, that the circuit court, in connection with the parties' divorce proceedings, has not yet made a judicial determination as to Plaintiff's interest, if any, in the property.

Defendant also suggests that no "transfer" occurred because he merely "left" the property with Maria Leucht when he moved out in January 1997. The Bankruptcy Code defines a transfer as:

> every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or with an interest in property, including retention of title as a security interest and foreclosure of the debtor's equity of redemption.

11 U.S.C. § 101(54) (1998). Further, the legislative history of § 101(54) provides that "any transfer of an interest in property is a transfer, including a transfer of possession, custody, or control even if there is no transfer of title because possession, custody, and control are interests in property." S.Rep. No. 95–989, 95th Cong.2d Sess. 27 (1978), U.S.C.C.A.N. 1978, pp. 5787, 5813. Therefore, when Defendant "left" items with Maria Leucht, which gave her possession of the property, he transferred the property within the meaning of § 727(a)(2)(A).

The remaining question is whether Defendant transferred the property with the intent to hinder, delay or defraud creditors of the estate. Using the "badges of fraud" test, Defendant's transfer of the property to Maria Leucht, within one year of his bankruptcy petition, indicates an intent to harm his creditors. Further, Maria Leucht gave no consideration and both shared a close association having once been married. In addition, the evidence shows that a significant amount of personal property has either been declared as missing or has ended up in the hands of Defendant's relatives. Thus, the totality of the circumstances suggests that Defendant transferred personal property with the intent to defeat any claims of creditors. Accordingly, the Court sustains Plaintiff's objection to Debtor's discharge pursuant to § 727(a)(2)(A) of the Bankruptcy Code.

Having decided that Defendant's discharge should be denied under 11 U.S.C. § 727(a)(2)(A), the Court need not address whether a denial of discharge is warranted pursuant to §§ 727(a)(4) and (a)(5). In addition, the Court need not determine whether Defendant's obligations under the circuit court order is a nondischargeable debt pursuant to § 523(a)(5), or alternatively, § 523(a)(15) of the Bankruptcy Code.

## CONCLUSION

Plaintiff has shown by a preponderance of the evidence that Defendant's discharge should be denied pursuant to §§ 727(a)(2)(A). As a result, it is unnecessary for the Court to determine the remaining counts of Plaintiff's Complaint. The Court will enter a separate judgment consistent with these Findings of Fact and Conclusions of Law.